*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0368p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRUCE OSBORNE,

*Plaintiff-Appellant,*

v.

No. 05-5536

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 02-02140—J. Daniel Breen, District Judge.

Argued: March 14, 2006

Decided and Filed: October 3, 2006

Before: COLE, GILMAN, and FRIEDMAN, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Don L. Hearn, Jr., GLANKER BROWN, Memphis, Tennessee, for Appellant. David A. Thornton, BASS, BARRY & SIMS, Memphis, Tennessee, for Appellee. **ON BRIEF:** Don L. Hearn, Jr., John I. Houseal, Jr., GLANKER BROWN, Memphis, Tennessee, for Appellant. David A. Thornton, BASS, BARRY & SIMS, Memphis, Tennessee, for Appellee.

FRIEDMAN, J., delivered the opinion of the court, in which GILMAN, J., joined. COLE, J. (pp. 6-8), delivered a separate dissenting opinion.

---

## OPINION

---

FRIEDMAN, Circuit Judge. The ultimate question in this appeal is whether an insurance company that was both the administrator of a disability benefits plan under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the issuer of the disability insurance policy thereunder, justifiably terminated disability benefits based on its determination that the disability had ended. The answer turns principally on the meaning of the

---

[*] The Honorable Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

1

insured's "own occupation" as used in the disability insurance policy.  The district court upheld the insurance company's application of that term.  We affirm.

I

In 1996 the appellant Bruce Osborne was the Chairman of the Board and President of Insurex Agency, Inc, and Insurex Benefits Administrators, Inc. (collectively "Insurex"), which his brief describes as "a small insurance agency and administrative company." Insurex was a wholly-owned subsidiary of TPI Restaurants, Inc., which operates the "Shoney's" chain of restaurants.  Osborne was a participant in Shoney's ERISA plan, which included disability insurance.  The appellee Hartford Life and Accident Insurance Co. ("Hartford") was both the administrator of the ERISA plan and the issuer of the disability insurance policy.  The disability policy provided coverage if Osborne became "Totally Disabled," defined under the plan as "prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis."

According to the job description, Osborne had the following duties as president of Insurex:

Responsible for the sales and marketing of new clients that entails extensive traveling.  Negotiating with insurance companies on quotes for proposals and renewal rates.  Providing customer service and assistance to the existing clients. Meeting with brokers to discuss prospective clients and existing clients. Oversee the internal functions of the company, staff and production issues.

In 1996, Osborne suffered a severe heart attack.  He resigned as president of Insurex in that month, but continued as Chairman of the Board.  Hartford began disability payments to him.  Prior to 1994, Osborne had travelled approximately two weeks out of the month.  In the last year of his employment, Osborne curtailed traveling to approximately one week every other month.

Following preliminary and more detailed investigations, Hartford concluded in 2001 that Osborne was no longer disabled and terminated his benefit payments.  The preliminary investigation had indicated that Osborne was playing golf and cards at his country club.  During the investigation Osborne had told Hartford that he played 70-80 rounds of golf a year.  He also had been seen on three occasions playing cards at the country club for several hours.

Hartford wrote Osborne that it intended to terminate his disability benefits "based . . . on policy language and all the documents contained in [Osborne's] claim file . . . ." Hartford stated that it had determined that under the United States Department of Labor's Dictionary of Occupational Titles ("the Dictionary"), Osborne's former position with Insurex was classifiable as "President, Financial Institution," which was a sedentary position whose work Osborne could perform.

Osborne administratively appealed that decision within Hartford.  Hartford then had Dr. Vita, a cardiologist, review Osborne's file.  Dr. Vita concluded that Osborne could perform the sedentary work that Hartford had concluded Osborne's position involved.  Dr. Vita's conclusion was contrary to that given by Osborne's treating physician, Dr. Newman.  Hartford adhered to its decision that Osborne no longer was disabled.

Osborne filed the present suit challenging Hartford's decision in a Tennessee state court. Hartford removed the case to the United States District Court for the Western District of Tennessee pursuant to ERISA's complete preemption provision, 29 U.S.C. § 1144(a).

The district court granted Hartford's motion for judgment on the record and dismissed the case. It ruled that Hartford's reliance upon the Dictionary as a basis for determining the meaning of "own occupation" in the insurance policy was not arbitrary or capricious, and that Hartford's determination that Osborne no longer was disabled was reasonable.

II

Hartford's termination of Osborne's disability payments - because he was once again able to perform the duties of his position and therefore no longer was disabled - rested on the following rulings: (1) the basis for determining his "occupation" was the Dictionary; (2) under the Dictionary his "occupation" was "President, Financial Institution"; and (3) this was a sedentary position whose duties he could perform. Hartford's determination that Osborne could perform those duties rested on its resolution of conflicting medical opinions.

Osborne's principal contention in this appeal is that Hartford improperly relied on the Dictionary in determining his "occupation." He contends that instead Hartford should have looked to the actual work he performed at Insurex which, he contends, involved substantial travel and required mobility by the performer.

Resolution of this issue implicates ERISA, the ERISA plan and the Hartford disability insurance contract that was part of that plan.

ERISA itself provides no light on the point. It defines "employee welfare benefit plan" and "welfare plan" to include any plan "providing for its participants . . . through the purchase of insurance . . . benefits in the event of . . . disability. . . ." 29 U.S.C. § 1002(1). An insurance company that issues an insurance policy under an ERISA plan may serve as the administrator of the plan, *see Kalish v. Liberty Mutual/Liberty Life Assur. Co. Of Boston*, 419 F.3d 501 (6th Cir. 2005), which is a fiduciary position, *see* 29 U.S.C. § 1104.

The ERISA plan provides for disability insurance coverage. Pursuant to this plan, Hartford issued a group insurance disability policy. The policy provides for payment of benefits during the time an employee is "Totally Disabled." § V, Art. 1. Benefits will be paid until the employee is "no longer Disabled." *Id.*

Section I of the policy defines "Totally Disabled" to mean that

you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis.

The insurance policy also provides that Hartford "has full discretion and authority to determine eligibility for benefits and to construe and interpret all [of its] terms and provisions." *Id.* The policy, however, does not state the basis upon which Hartford will determine disability, i.e., whether an employee is unable to perform the duties of the employee's "own occupation."

In light of the insurance policy's provisions relating to Hartford's making disability determinations, we conclude that the policy contemplates that Hartford will have broad discretion in determining what is an employee's "own occupation," including the basis for making that determination.

As the district court stated and as Osborne recognized, the ERISA plan in this case, which "gives the administrator . . . discretionary authority to determine eligibility for benefits," is reviewed to determine whether Hartford's action is arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). This standard applies to Hartford's decision to use the Dictionary to determine Osborne's "own occupation." Here, as the district court ruled, "the policy in this action grants Hartford full discretion and authority to determine eligibility for benefits and to construe the terms of the plan." The district court correctly recognized that "[t]he arbitrary or capricious standard is a 'highly deferential standard of review.' *Yeager v. Reliance St. Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996)."

We agree with the district court that Hartford's use of the Dictionary to determine Osborne's "own occupation" was not arbitrary and capricious, but on the contrary was "reasonable." The word "occupation" is sufficiently general and flexible to justify determining a particular employee's "occupation" in light of the position descriptions in the Dictionary rather than examining in detail the specific duties the employee performed. "Occupation" is a more general term that seemingly refers to categories of work than narrower employment terms like "position," "job," or "work," which are more related to a particular employee's individual duties. Although reasonable persons may disagree over the most appropriate methodology for determining a particular employee's "occupation," we cannot say that Hartford transgressed the boundaries of its broad discretion under its insurance policy and the ERISA plan to make disability determinations. *Cf. Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 272 (4th Cir. 2002) (stating that use of a Dictionary job description is an acceptable reference when the description "involve[s] comparable duties").

Apparently this court has no published opinion addressing this issue. Our unpublished opinion in *Schmidlkofer v. Directory Distrib., Assoc., Inc.*, 107 Fed. Appx. 631, No. 03-5755, 2004 WL 192184 (6th Cir. August 25, 2004), supports our conclusion here. There, this court noted that "[m]any courts have upheld a plan administrator's interpretation of 'regular occupation' as meaning a general occupation rather than a particular position with a particular employer." *Id.* at 633.

In that case an insurance company had terminated disability benefits because, relying on the Dictionary, it concluded that the employee no longer was disabled since she was able to perform the duties of her "regular occupation" - the "totally disabled" standard under the policy there involved. This court reversed the district court's rejection of the insurance company's ruling. It held that the insurance company's "interpretation of 'regular occupation' as meaning Schmidlkofer's occupation as a branch manager, rather than her former position at Directory Distributing, is rational in light of the policy's provisions."

The only possibly significant distinction between that case and the present one is that there the policy term was "regular occupation" and here it is "own occupation." That relatively minor difference in language does not warrant a different result. The critical issue in both cases is whether the insurance company acted reasonably and rationally in relying on the Dictionary to determine the employee's "occupation."

Osborne contends that the policy language should be construed against its drafter Hartford. *See University Hosps. v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000) (applying *contra proferentum* to ERISA contract). We apply the doctrine of *contra proferentum*, however, only if the contract term is ambiguous. *See Perez v. Aetna Life Ins.*, 150 F.3d 550, 557 n.7 (6th Cir. 1998) (en banc).

This case does not involve the interpretation of ambiguous contractual language that should be construed against the drafter of the contract. The dispute before us is not over the meaning of "own occupation," which defines the term "Total Disability," but over the methodology Hartford used to determine Osborne's occupation. Even if the doctrine of *contra proferentum* applies in interpreting ERISA plans, the doctrine does not apply here.

Osborne also argues that Hartford's methodology was arbitrary and capricious because of the inherent conflict of interest in Hartford's dual role as the administrator of the ERISA plan and the issuer of the insurance policy under the plan. The district court properly rejected this contention because, as recognized in *Peruzzi v. Summa Medical Plan,* Osborne needed to provide "significant evidence" that the alleged conflict of interest influenced Hartford's decision. 137 F.3d 431, 433 (6th Cir. 1998). Osborne has not done so. The sole basis of his conflict of interest claim is the institutional one of Hartford's dual capacity.

III

In his reply brief, Osborne argues that he "is not the President of a Financial Institution, but the president of a small insurance agency and essentially a full-time sales agent." He contends that "The Hartford had available in the [Dictionary] a more accurate description of Osborne's occupation[,]" namely, "Sales Agent, Insurance."

Osborne, who was represented by counsel before both this court and the district court, did not make this argument in his opening appellate brief. There, his argument was that Hartford's denial of Osborne's disability benefits was arbitrary and capricious because Hartford "failed to consider the duties of Mr. Osborne's actual occupation. Mr. Osborne's actual job duties required extensive traveling and extremely long hours," and instead "applied the [Dictionary] definition of 'President, Financial Institution' to describe Mr. Osborne's occupation as one that was 'sedentary.'" (Osborne raised only that question in his "Statement of Issues for Review.") Although Osborne stated that "[t]here was no reason" and "no evidence" for Hartford "to assume that [Hartford's choice of Dictionary definition] described" Osborne's actual job, other than "its conflict o[f] interest," he never argued that this itself was a reason for reversing the district court. Similarly, he did not make the argument before the district court, which may explain the district court's failure to discuss it. Indeed, his failure to raise the issue there resulted in the lack of a fully developed factual record on the point.

We ordinarily do not entertain an argument first made in a reply brief. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 318 (6th Cir. 2005). Although this court apparently has recognized an exception to this principle for legal issues, *see*, *e.g.*, *Logan v. Denny's Inc.*, 259 F.3d 558, 570, n.6 (6th Cir. 2001), Osborne's new argument that he was not the president of a financial institution is primarily factual. *See also Taft Broad. Co. v. United States*, 929 F.2d 240, 243-45 (6th Cir. 1991) (discussing when this court will consider an issue not raised in the district court). Osborne offers no excuse or explanation for his untimely raising the issue. His argument comes too late, and we decline to consider it.

In the first part of his reply brief, under the caption "Standard of Review," Osborne argues at considerable length that, on the merits, Hartford's conclusion that his disability had ended was arbitrary and capricious. Once again, this is a new argument that Osborne had not made in his opening appellate brief which, as noted, challenged as arbitrary and capricious only Hartford's reliance on the Dictionary to determine Osborne's "own occupation." Like his argument that he was not the president of a financial institution, we decline to consider this untimely new contention.

*Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005), on which Osborne relies in that argument, does not aid him. In *Calvert*, there was no question of the insurance company's reliance on the Dictionary, which it did not do in terminating the employee's benefits. The sole question in *Calvert* was whether, considering all the circumstances, such termination was arbitrary and capricious. In reversing the district court's ruling in favor of the insurance company, this court decided only that the termination was arbitrary and capricious. This court did not say anything about reliance on the Dictionary as a basis for determining the employee's "own occupation," which was not the issue in *Calvert*.

CONCLUSION

The judgment of the district court dismissing the complaint is affirmed.

---------------

**DISSENT**

---------------

R. GUY COLE, JR., Circuit Judge, dissenting. I respectfully dissent because I believe that the plain language of the disability policy compelled Hartford to consider Osborne's actual job duties as President of Insurex in its review of his continued entitlement to benefits. In addition, Hartford has failed to provide a reasoned explanation for its reliance on the Dictionary where the record evidence shows, among other things, that Hartford did not dispute the accuracy or reliability of the job description provided by Osborne, and Hartford admits that there is a discrepancy between the significant travel required by Osborne's actual position and the Dictionary's classification of his occupation as sedentary.

## I. STANDARD OF REVIEW

The majority correctly states that our review of Hartford's decision to terminate Osborne's disability benefits is governed by the "arbitrary and capricious" standard. This standard has been described as "the least demanding form of judicial review of administrative action." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (internal citation omitted). However, as we recently noted in *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005),

> merely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions . . . Indeed, deferential review is not no review, and deference need not be abject.

## II. DISCUSSION

Osborne's disability policy with Hartford provides that he is eligible to receive long-term-disability payments if he is "totally disabled." Under the policy, "Totally Disabled means you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis." The question is whether, where the policy does not define "your own occupation," it was reasonable for Hartford to fix the meaning of Osborne's "own occupation" by reference to the Dictionary definition for "President, Financial Institution," to the exclusion of Osborne's actual job duties.

As an initial matter, the majority cites this Court's unpublished opinion in *Schmidlkofer v. Directory Distrib. Assocs., Inc.*, 107 Fed. Appx. 631 (6th Cir. 2004), in support of its decision that Hartford did not exceed its discretion in relying on the Dictionary. In *Schmidlkofer*, this Court concluded that it was rational for the defendant insurer to consult the Dictionary to determine the nature of the plaintiff's occupation, rather than look to her specific duties as manifested in her actual job. *Id.* at 634; *but see Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 386 (3d Cir. 2003), *cert. denied*, 541 U.S. 1063 (2004) (holding that "[b]oth the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' make clear that 'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability"). The policy language at issue in *Schmidlkofer* was "regular occupation," not "own occupation," like that here. The majority dismisses this distinction as a "relatively minor difference in language [that] does not warrant a different result." I respectfully disagree.

Whatever the meaning of "regular" is, it is not synonymous with "own." *Mizzell v. The Paul Revere Life Ins. Co.*, 118 F. Supp. 2d 1016, 1021 (C.D. Cal. 2000) (commenting, while comparing a disability policy that spoke in terms of the claimant's "regular occupation," with one that spoke in terms of the claimant's "own occupation," that "[i]f anything, the phrase 'regular' seems more general in nature than 'own'"). Used as an adjective, as it is here, "own" means "belonging to oneself or itself"; "used to specify an immediate or direct relationship." *Webster's Third New International Dictionary* 1612 (1986). Construing the policy language according to its "plain meaning in an ordinary and popular sense" then, "own occupation" refers to Osbourne's actual job duties. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000). If it was otherwise, if the policy language really meant the generic responsibilities associated with Osbourne's occupation, there would have been no reason to include the word "own." The same meaning could have been accomplished by couching the definition of "total disability" in terms of "your occupation," rather than "your own occupation." This Hartford did not do. As a result, it seems to me that we ought not render "own" surplusage by reading it out of the policy language. *See Union Inv. Co. v. Fid. & Deposit Co. of Md.*, 549 F.2d 1107, 1110 (6th Cir. 1977) ("A contract will not be construed so as to reject any words as surplusage if they reasonably can be given meaning."); *see also Cunningham v. The Paul Revere Life Ins. Co.*, 235 F. Supp. 2d 746, 756 (W.D. Mich. 2002) (interpreting "own occupation" in a disability policy as referring to the claimant's actual job duties rather than the general description contained in the Dictionary); *Mizzell*, 118 F. Supp. 2d at 1021-22 (same).

Second, even assuming that the phrase "own occupation" is susceptible to two meanings, Hartford has failed "to offer a reasoned explanation, based on the evidence," for relying on the Dictionary. *Calvert*, 409 F.3d at 292; *see also Lasser*, 344 F.3d at 386 (stating that the policy administrator's interpretation of ambiguous language must be reasonable to be entitled to deference).

As part of its initial review of Osborne's claim for disability benefits, Hartford asked for and received a job description from Osborne. This job description explained that Osborne traveled frequently—approximately two weeks out of every month (curtailed to one week every other month in the year prior to his resignation)—as part of his regular duties. Thus, in 1996 Hartford granted Osborne's claim for disability benefits on a record that included the job description provided by Osborne. Hartford still had Osborne's job description in hand in 2000 when it undertook its evaluation of Osborne's continued entitlement to benefits. Nonetheless, rather than consult Osborne's job description, Hartford researched the occupations in the Dictionary, determined that Osborne's job most closely matched that of "President, Financial Institution," and because the Dictionary classified "President, Financial Institution" as a sedentary position, Hartford terminated Osborne's benefits on the grounds that he was capable of performing sedentary work.

Hartford does not claim that the job description supplied by Osborne outlining his actual duties was in any way inaccurate or insufficient to enable Hartford to understand the nature of Osborne's responsibilities and assess whether he could return to work as President of Insurex. Hartford also does not dispute that Osborne was required to travel regularly to fulfill his duties. In fact, Hartford acknowledges the discrepancy between Osborne's actual travel requirements and the Dictionary's classification of "President, Financial Institution" as sedentary, but insists, without any explanation, that the Dictionary applies: "Although Mr. Osborne's specific job in the occupation of a 'President of a Financial Institution' may have involved traveling, the occupational requirements per the DOT Code, does not require traveling." Finally, the record is devoid of any evidence that business travel is not in fact a typical feature of Osborne's occupation as it is performed by other persons at comparable institutions. *See Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 253 (2d Cir. 1999) (holding that the institution where the plaintiff was employed had to be considered in defining her "regular occupation"); *Lasser*, 344 F.3d at 387-88 (concluding that survey evidence of other orthopedic surgeons showed that emergency surgery and being on-call were material aspects of the plaintiff's occupation). On these facts, I cannot conclude that Hartford's reliance on the Dictionary was reasonable.

Accordingly, I would reverse and remand to the district court for consideration of whether, in light of Osborne's specific job duties as President of Insurex and the medical evidence in the record, Hartford's termination of Osborne's disability benefits was arbitrary and capricious.